**BARRETT, FITCH, NORTH & CO., Incorporated, a Missouri Corporation, Plaintiff-Appellant,**

v.

**R. Lofton HUDSON and Jessie L. Hudson, Defendants-Respondents.**

No. 24348.

Kansas City Court of Appeals.

Missouri.

April 4, 1966.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 6, 1966.

John H. Kreamer, Kenneth V. Butler, Gage, Hodges, Park & Kreamer, Kansas City, for appellant.

Winston V. Buford, Eminence, John C. Thurlo, Swanson, Midgley, Jones, Blackmar & Eager, Kansas City, for respondents.

BROADDUS, Special Commissioner.

This is a suit in equity to rescind the sale of corporate stock and to compel a return of the purchase price. Judgment was for defendants and plaintiff appealed.

In 1956, Dr. R. Lofton Hudson and his wife, Jessie L. Hudson, defendants-respondents, purchased 100 shares of capital stock in the American Founders Life Insurance Company for $6 per share. A certificate representing said shares was issued to them

bearing the date of December 11, 1956, and these shares were owned by them until on or about August 31, 1961, when they were sold to Barrett, Fitch, North & Co., Incorporated, the plaintiff-appellant, a Missouri Corporation engaged in the securities business.

Dr. Hudson is a pastoral counsellor, being the founder and director of the Midwest Christian Counseling Center. Prior to the founding of that concern in January of 1956, he was pastor at the Wornall Road Baptist Church in Kansas City from 1952 to 1957, and before that in other pastorates in Oklahoma and Tennessee. He had been a Baptist minister since 1932.

Other than his purchase and sale of the shares of stock here involved, Dr. Hudson had never had any dealings or experience with stocks, and had made no study concerning information about stocks and bonds. He bought these shares on the recommendation of a Baptist minister whom he had known in Oklahoma and who advised him the stock "was going sky high" and would be worth $1500 within a year. Although he had a vague recollection of receiving some correspondence "for a while" after he first bought this stock Dr. Hudson testified that he never had any actual notice or knowledge of the change in the corporate name of the company.

In February, 1961, The American Founders Life Insurance Co., the company in which the Hudsons owned the shares in question, changed its name to Falcon National Life Insurance Co.

On or about August 1, 1961, Dr. Hudson called Barrett, Fitch and talked to Mr. Roger Bell, a broker employed by Barrett, Fitch. He told Mr. Bell that he owned shares of stock in The American Founders Life Insurance Co. and requested information about the stock's value. Mr. Bell thereupon consulted the daily quotations for over-the-counter securities in the "pink sheets", a daily stock price service put out by the National Quotation Service, and found one listing for The American Found-

ers Life Insurance Company. The pink sheets indicated that the bid price for the stock was $26, but that none was offered and there was no "ask" quotation. The pink sheets showed only one stock selling under the name of The American Founders Life Insurance Co. The price and the name and address of the dealer making a market in the stock was the essential information given in the pink sheets. They did not show the state of incorporation of the company. Mr. Bell told Dr. Hudson what the price was and Dr. Hudson asked Mr. Bell what he knew about the stock and whether he advised selling at that price, Mr. Bell told Dr. Hudson that he was not familiar with the company and had no opinion about the stock. Dr. Hudson then asked Mr. Bell if he could find out more about the stock's value and told him that he would talk to him in a couple of weeks.

Mr. Bell agreed to get more information about The American Founders Life Insurance Company and contacted the dealer shown in the pink sheets who made a market in the stock and learned from him the business address of the company. Mr. Bell wrote to the company and asked for information and in response received the annual report of the company for 1960. Mr. Bell read the report, talked to Dr. Hudson again, and told him about the annual report. Mr. Bell also told him that the price of the stock had increased in the meantime to $27½. Dr. Hudson thereupon told Mr. Bell that he wanted to sell his shares of stock and Mr. Bell said that Barrett, Fitch would purchase his shares at the current market price, $27½ and asked Dr. Hudson to send in his certificate. Dr. Hudson sent in the certificate and Mr. Bell received it in a day or two. Barrett, Fitch sent Dr. Hudson a check for $2748.92 in payment of the shares on or about August 31, 1965.

Mr. Bell gave the certificate to Mr. Russell Sparks, manager of the trading department at Barrett, Fitch, with an order to sell. The certificate was sent by Barrett, Fitch to the broker in Texas who purchased the shares from Barrett, Fitch. The Texas

broker, after receipt of the certificate, notified Barrett, Fitch that the certificate was not for shares in The American Founders Life Insurance Co., the company whose stock price was quoted in the pink sheets and whose shares Barrett, Fitch thought they were purchasing, and returned the certificate. The shares purchased and sent to the Texas broker were shares in the Falcon Life Insurance Co., whose name prior to February, 1961, had been The American Founders Life Insurance Co., which was the same name as that used by the Texas company, the only company bearing that name in August, 1961. Upon learning of the refusal of the Texas broker to accept the Falcon National shares sent, Barrett, Fitch bought 100 shares of The American Founders Life Insurance Company stock at the market price and sent them to the Texas broker in order to comply with the terms of its sale to the Texas broker.

Mr. Bell was notified of the refusal of the Texas broker to accept the Falcon National shares and he thereupon checked the National Stock Summary in order to learn more about the difference in name and found that until February, 1961, there were two companies using the name, "The American Founders Life Insurance Co.," one a Colorado corporation whose name had been changed to Falcon National Life Insurance Co., in February, 1961, and the other a Texas company still bearing that name and being the only stock of that name traded and quoted in daily market services after that date.

Mr. Bell then called Dr. Hudson and told him that the shares he had sold to Barrett, Fitch were not what he had assumed them to be, but were in reality shares in a totally different company, Falcon National. Mr. Bell offered to return the 100 shares of Falcon National to him if he would return the money Barrett, Fitch had paid him. Mr. Bell explained the name confusion which had resulted in the mistake and on two or three different occasions offered to return the shares for the money, but each time Dr. Hudson refused to accept the offer of rescission.

Appellant contends that the trial court erred in failing to find that both parties "were mutually mistaken as to a material fact, namely, the true identity of the shares sold, and therefore erred in failing to rescind the contract and place the parties in statu quo."

■ In our opinion the evidence shows that the only mistake involved in the transaction in question was appellant's unilateral mistake induced solely by appellant's failure to inform itself. It is clear that Dr. Hudson was not guilty of any misrepresentation concerning the stock appellant purchased from him. The evidence shows that after August 1, 1961, witness Bell knew he was dealing with a Texas based company. It also shows that at all times in question there were immediately available to Bell at appellant's office reference materials which would have shown that there were or had been, two companies with confusingly similar names. He could have checked these in a matter of a·few minutes but he never bothered to do so until long after August, 1961. On August 25, 1961, Bell already had written to Texas to secure information from the company. He then had received an annual report showing that "American Founders Life Insurance Company" was a Texas based company. The annual report and the certificate evidenced by Exhibit 2 show the company names are not exactly identical. Bell obtained physical possession of respondents' stock certificate (Exhibit 2) a full week prior to the date of payment. On the face of this certificate in bold type appear the words: "Incorporated under the laws of the State of Colorado." Notwithstanding all this, Bell proceeded with the transaction without bothering to make the small effort which would have disclosed the "mistake."

It is also quite plain that Dr. Hudson intended to sell the stock he owned without regard as to whether it was stock in

a Texas or Colorado corporation. He had some shares in a company which he wished to sell. As far as he was concerned an offer was made to purchase this stock and he sold it. Dr. Hudson certainly was not aware of Bell's mistaken assumption that his stock was in a Texas company. Under these circumstances there was plainly no mutual mistake of fact justifying rescission as herein sought by appellant.

■ In the early case of Brown v. Fagan, 71 Mo. 563, it was held: "Equity will not relieve against mistake when the party complaining had within his reach the means of ascertaining the true state of facts, and, without being induced thereto by the other party, neglected to avail himself of his opportunities of information."

The above case has been cited with approval many times. One of the cases following it is by this Court, Houston, et al., v. Welch, 204 Mo.App. 279, 223 S.W. 1076, a case quite similar to the instant case. That case was an action in equity in which a brokerage house sought to rescind a sale of corporate stock and compel its selling customer to return the purchase price. The defendant owned a certificate of 1000 shares in a corporation named "Consolidated Arizona Copper *Mines* Company." Unknown to her and to plaintiff there was another corporation by the name of "Consolidated Arizona Copper *Smelting* Company." Some two or three weeks before the sale sought to be annulled, defendant called plaintiffs by telephone and inquired as to the value of her stock. She gave the correct name of her stock and was told it was worth about $1500 less the commission. Sometime later she took her stock certificate to plaintiffs' place of business and asked what she could get for it. Plaintiffs took the stock certificate, examined it and wired a firm in New York asking at what price 1000 shares of "Consolidated Arizona Copper *Mines* Company" could be sold. The New York firm wired a reply based upon which plaintiffs told defendant at what price her stock could be sold. De-

fendant then ordered plaintiffs to sell the stock. Shortly thereafter plaintiffs informed defendant that her stock had been sold in New York. Plaintiffs then made a calculation of the amount due at the price quoted by the New York firm, deducted from this figure their commission and issued defendant a check in payment of the net amount due her. Defendant endorsed her stock certificate in blank, leaving it with plaintiffs, and accepted, and subsequently cashed, plaintiffs check for the net amount plaintiffs had calculated to be due her. Plaintiffs then sent the stock certificate to the New York firm which returned the certificate to plaintiffs and refused to pay for it because the New York firm had made a mistake as to the name of the corporation, thinking it was buying a certificate of stock in the "Consolidated Arizona *Smelting* Company." In denying plaintiffs' prayer for rescission and return of the purchase price paid by plaintiffs to defendant, this court said:

"* * * whatever mistake the New York firm made, *it was one of their own negligence,* for they were given the correct name of the stock offered, and used that name themselves when they replied naming the price.

"The petition does not disclose that plaintiffs were the agents of both defendant and the New York broker; and, as stated, the evidence shows that defendant knew only that the stock was being sold in New York. Indeed, the New York firm bought the stock themselves, since they inserted their name in the blank assignment. * * * So that at best, the evidence shows that the defendant sold, through plaintiffs, a certificate of stock to the New York firm, and the plaintiffs, being acquainted with and having confidence in the firm's meeting its obligations, and according to the usual practice in such matters, paid defendant the money therefor, and then when the New York firm discovered that it had made a mistake (and that through no other cause than their own negli-

gence), it refuses to pay; whereupon plaintiffs sue to recover of defendant on the ground of mistake.

"It would seem that the petition stated no cause of action in equity for a rescission of the contract on the ground of mistake. (Citing cases)

" * * * it is beyond question that *the only one who made a mistake,* if one was committed, was the New York firm who, so far as defendant was concerned (and the evidence itself tends to show this), *was the purchaser of the stock.* Neither the plaintiffs nor defendant did anything to mislead the purchaser. It had the facts fully before it, and the telegrams which passed to and fro admit of no misunderstanding. *If the purchaser made a mistake, it was wholly its own fault, which ordinary diligence would have obviated. Hence equity cannot relieve against it.* (Citing cases) That plaintiffs have no cause of action against defendant will more readily appear if we leave plaintiffs out of consideration and treat the transaction as if defendant had herself sold the stock to the New York purchaser, and in fact this is what was done; the defendant having done what she did through plaintiffs. *Suppose defendant had herself sold the stock to the purchaser under the same circumstances as did the plaintiffs, and suppose the purchaser had paid for it with his eyes open, but by a negligent mistake* (as he did agree with plaintiffs to do), *could the purchaser in that event have turned and sued defendant to recover the money so paid? We think not, for the mistake, if there was one, was wholly that of the purchaser and a result of his own negligence.* Defendant in no way participated therein, nor did she do anything to mislead or deceive the purchaser. Now, merely because the plaintiffs, in accordance with the usual custom in such cases advanced the money and paid it to defendant for the purchaser, gives them no better rights or claim against the defendant than the purchaser would have

had if it had paid defendant." (Emphasis supplied)

It would unduly lengthen this opinion to discuss in detail the many cases cited by appellant. They are clearly distinguishable from the instant case.

The judgment should be affirmed. Your Special Commissioner so recommends.

The foregoing opinion by BROADDUS Special Commissioner, is hereby adopted as the opinion of the Court and the judgment is affirmed.

All concur.